The next case today is 523-1104, People v. D'Amato. Arguing for the appellant is Madeline Springer. Arguing for the applee is Louis Hizzo. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please remember only the clerk of the court is allowed to record. Thank you. This is case number 523-1104, People v. Mindy D'Amato. I'm Justice Moore presiding. Also on this case, on the panel, are Justices Welch and Cates. They're not able to be here this afternoon, and so you have me. And they'll be participating. The arguments are being recorded. They'll be able to listen to the arguments, and they have the briefing, and there'll be full participants on the panel. So the appellant may proceed. Please state your name for the record. Thank you, Your Honor. My name is Madeline Springer, and I represent the appellant, Ms. Mindy D'Amato. May it please the court. Ms. D'Amato was convicted of driving with a revoked license and making a false police report, but the state's case hung entirely on a show-up identification by Zeriang made after he was exposed to post-event information. Mistaken witness identification is responsible for more wrongful convictions than any other cause combined, and of those, a vast majority relied on a single eyewitness identification, and this is one of those cases. The officers here were part of the Champaign County Police Department, which has taken multiple steps to try to prevent eyewitness misidentification, but Officer Wells testified that with all of the benefits those changes brought, meaning more reliable information, they also took more time. So he and Officer Rivera chose instead to do a show-up identification. But show-ups have been recognized as some of the condemns them for this reason, except in very limited circumstances, none of which occurred here. You cited the Supreme Court, but you only cited dissents, as far as I could tell. Well, this analysis is still the same, and those dissents have cited research concerning eyewitness identification that more and more state cases are recognizing, including this state, when we look at people being learned. And none of the reasons that courts, that Illinois courts usually say a show-up is fine, existed here. This was not prompt. It was four and a half hours later. It was not near the scene. It was over a mile. It was the same day, wasn't it? It was what? The same day. It was the same day, but this was the situation. I've looked at the facts here, and one thing that really stood out to me is before the show-up, he was asked to describe her, and he says, 162 centimeters. Now, before this case, were you able to, off the top of your head, say how tall 162 centimeters is? No, Your Honor, I was not. Neither could I. But how close to the defendant's height is 162 centimeters? Only one inch off, but that's the average height of a woman. Well, that's a good response, but he actually also demonstrated it by demonstrating it by his hand, and I thought that was impressive that he could say within an inch how tall the defendant or the person that he had met was. So, I thought that was an important fact. Now, under the Biggers case, I think that's the right name. That's the correct name, isn't it? Yes, Your Honor. What are the factors? Yes, the biggest factors, we look to opportunity, view the driver, degree of attention, accuracy of Yang's description, the certainty that they expressed at the time of the confrontation, and then the time between the incident and the confrontation. And almost all of those factors very much support that this was not an independently reliable identification, that Yang was influenced by the excessive suggestion. Again, they tainted what is in Illinois recognized as an inherently suggestive procedure, even more so by saying Ms. D'Amato was trying to report the car stolen. There's no possible benefit. It is well recognized that memory is easily distorted by that type of information, and by telling Yang, they connected Ms. D'Amato to the incident, and they implied that she was trying to potentially lie to police to avoid paying for the damages to his car. Initially, looking under the Biggers factors, but actually, Illinois actually also considers a sixth factor under People v. McTush, which is whether or not Yang had any prior acquaintance with Ms. D'Amato, and they were not. They were complete strangers. So was the driver, for that matter, which the U.S. Supreme Court deems proverbially untrustworthy. It's also a stressful situation, given that it was his first car accident, and this is a cross-racial identification, which has been deemed over one and a half times less likely to be correct. They did come out at trial when she reported the car stolen. She reported the car stolen several hours later, because then they go pick up Yang and bring him directly to respond to that. What time did she report it? I think, I have to look, I think maybe an hour before the identification itself, but I'd have to look. I'm sorry. I apologize, Your Honor. But when we look, again, she's- An important fact to know? Well, it's still four and a half hours later. We're focusing on whether or not this identification is independently reliable, and so when we look at the facts, we look at attention, a degree of attention. His attention was focused not on the driver. It was where the average person would assume one would focus right after a fender bender, which is on the damage to the vehicle. Okay. When she became, whoever he had the wreck with, became unwilling to share information, that's when he went and took a picture of the license plate. Is that right? She was willing to share information. She was just asking him not to call the police, and then when he's taking photos- But he wasn't willing to not call the police, was he? No, he was determined to call the police from the very beginning. He makes that very clear to Yang. I mean- Well, do you think it's significant that her driver's license was revoked? We don't know that at the time. Again, we're just looking at the identification, Your Honor, and when we look at that, it's not reliable. He was focused. This wasn't a case where it's a robbery. We're at any reason to focus on her appearance. It's actually the opposite. He was focused on the car. Then that's supported by the fact that he says, I don't know what her hair looked like, and his description is she's maybe white or Hispanic and used his hands. That represents a huge number of women in Champaign, and when we look at descriptions, a vague description is more likely to be accurate than a more detailed description because there's more room for error, which is the exact thing that we're trying to avoid when we're talking about an eyewitness identification. And then we look at level of certainty, which is the fourth factor, and that also looks to, or also demonstrates in this case, Yang's unique deference to these officers clearly conveyed suggestion that this person was the driver because he was twice willing to identify Misty Amato as the driver before he ever had a decent view of her face. He says from the very beginning, I'm 80% sure that's her, and then after Wells asks, he goes, oh, well, I couldn't see her face just by the outside, but from that point of view, you could only see her back. She's wearing loose jeans, a large plain black coat over multiple layers of clothes, and a hat covering most of her hair and face. What date was it? Go ahead. I'm sorry, Your Honor. What date was it? I'm interested in what time of year. It's the winter? No. It's dark out. It's cold. And then the second point of view, we're over 40 feet away. Same pattern. Yang says, yeah, that's her. Wells asks, are you sure? He says, based on her size and her clothes. Then Wells asks, what about her face and her hair? He says, hair, can't see, she has a hat. And then face, he leans forward and is trying to see her face. So that's two times he's willing to say, yes, with certainty, that's her, before he really clearly saw her face. And at trial, we have his testimony that shows that he's willing to be, to express certainty about things that from videos we know are not accurate. He says at trial, from the very beginning, I initially told police, she's wearing camouflage and had a hat on. We know from the video that's not true. Then we look also, he says, I know with certainty that I saw her face when I said I was 80% sure. But from his own words on the video, he said he couldn't see her face. Your honor, I see that my time has expired. Well, I've taken up enough of your time. You can complete your points. Sorry about that. That's the point of this, your honor. Thank you. So we know that he's willing to express- I get complete control when I'm here alone. That you do. And so complete certainty when he's not certain. And that makes sense when we look at evidence or at research that this Illinois Supreme Court has found relevant in people v. Lerma. And it's that memory doesn't get better over time, it gets worse. We just think that it gets better because we substitute in post-event information and believe that it's a real memory. And then turning to the last factor, which is the time between the crime and the confrontation, that perfectly summarizes why this is not a reliable identification. Four and a half hours passed between the car accident and the identification. Timing is critical because the greatest memory depletion occurs within hours after an event. And Yang's weak initial memory was subjected to time, stress, fear, influence of a show-up, influence of a post-event information implying Ms. D'Amato is a criminal, and his unique vulnerability to authority, especially where it's clear on the video that he's afraid and the only people there to protect him are the officers. Ms. D'Amato's convictions for driving on a revoked license and making a false police report rest entirely on this pretrial procedure. Yang never made an inquiry identification. It's not even her car. The state failed to prove both offenses beyond a reasonable doubt. If there are no more further questions at this time, I will reserve my conclusion for rebuttal. Thank you, Your Honor. Thank you, counsel. We'll now hear from the appellee. Please state your name for the record. Yes, Your Honor. Chief Justice, Your Honors, and may it please the court. My name is Louis Hizon. I represent the appellee on the matter. Your Honor, as an initial point, just to your question about when the time frame of this, it was September 30th, so it was just shortly, well, closer to the end of fall there. The defendant does challenge the trial court's ruling. Those nights, isn't it? Yes, Your Honor. Here, the defendant does challenge the trial court's ruling on her pretrial motion to suppress the evidence of the show-up identification. And again, as highlighted in our brief, as an initial point of contention, we do maintain that that claim has been forfeited on appeal because she failed to preserve the issue by challenging the court's ruling on a post-trial motion or a motion for a new trial. Again, that's been highlighted under our People v. Hillier, indicating that in order to preserve a claim for appeal, the defendant must object and file a written post-trial motion. Here, the record indicates that there was a lack of inclusion of that in the post-trial motion. So therefore, the plain error rule allows this court to consider unpreserved claims under specific circumstances. And so here, the defendant has to show clear and obvious error. And if there was error that occurred, the defendant then has to establish that the evidence at trial was closely balanced, that the error alone therefore tipped the scales of justice. Here, the defendant cannot establish that an error occurred because the identification procedures were not impermissibly suggestive. And so the court here has to find that the trial court's ruling was therefore manifestly erroneous. The defendant bears the burden of establishing that procedures here during the identification were quote-unquote impermissibly suggestive. And then we do know that in order to determine whether the impermissibly suggestive of the identification, Illinois has employed a two-prong test in order to make that determination. And the first question that we have to ask is whether the procedures were suggestive in nature. And then second, if they were, the court then has to inquire then on whether the identification testimony was so tainted that it made it unreliable. So as to the first prong, the identification procedures were not suggestive for three reasons. First, the record reflects that the officers were very clear with Mr. Yang on their way to conduct the show-up that although the vehicle had been reported stolen, the person who reported it could have been someone other than the person who was involved in the accident with him. To this point, Officer Wells' testimony specifically supports this notion that Mr. Yang was told numerous times on the way to the show-up that the individual may not be the same person from the accident. Secondly, officers did not at any point suggest that the individual who reported the vehicle stolen was doing so to avoid liability for the accident. Now I know there is contention between all the briefs in regards to this point. The state maintains that at no point did the officers explicitly tell Mr. Yang that that person had reported this car stolen in order to avoid liability. Third, Mr. Yang did not adopt his description of the defendant to conform with the officer's inquiries regarding the defendant's hairs or other questions on the way to the show-up. This factor is especially important because it shows that Mr. Yang exercised a review of the defendant cautiously and independently, further establishing the self-reliant nature of this identification. It is true that the Supreme Court has held that a show-up identification of a suspect standing alone may carry a degree of improper suggestion and that is somewhat of what occurred because of the nature of the identification. However, not every viewing of a suspect alone will be considered a denial of due process as there can be justifying circumstances and we cited people we stacked to this point where a principal factor was that the identifying witness had an excellent opportunity to observe the defendant at the time of the incident, which leads me then to the second prong. What opportunity did he have when he met her at the accident scene? Your Honor, so there is multiple exhibits and I would specifically point to the first encounter where officers do approach Mr. Yang and he indicates that he was able to talk to the defendant following the fender bender and that she immediately wanted to settle the issue privately and offered, if I recollect correctly, she offered her insurance card and Mr. Yang denied the insurance card. Now, in that video, he tries to give officers a reasoning for that and you can see that officers are a little bit unnerved about it because their response to him is, hey, this would have been a lot more easier for all of us if he had been able to obtain her information. And so, the state maintains that Mr. Yang's opportunity to engage with the defendant during that instance, actually approach her and physically see her features was, you know, something that was especially important to this identification, which again, similar to People v. Speck, which is cited within our brief. And Your Honor, that is entirely to my second point here, which, you know, the question as to whether the identification testimony here was so tainted to unreliable. I understand that counsel cited the Supreme Court brief regarding the factors and I cited People v. Ortiz from Illinois, which again, talks about the similar factors to determine that. To this point, Mr. Yang's testimony provided that he had an excellent opportunity to view the defendant immediately after the accident. As the testimony presented that Mr. Yang confronted the driver right after and she attempted to provide him with the insurance information. And furthermore, that confrontation allowed Mr. Yang an excellent opportunity to see her facial features, which later assisted him in identifying the defendant later that evening. It also supports Mr. Yang's degree of attention, that factor of the degree of attention, as Mr. Yang was so close in this instance, the defendant, that he would have been able to observe any characteristics or, you know, different qualities that he would be able to remember. There was also a high level of accuracy from the descriptions provided by Mr. Yang, as he was able to provide officers with a good description of her despite the language barrier, such as expressing the approximate height of the defendant, which ended up actually matching the age range of 20 to 35, which matched the defendant's age. And though, you know, defendant asserts that the age was not initially provided during the first interview, the record on page 77 reflects that a defendant did provide the age description on the way to the show up when they asked them to provide further details, as well as he was able to provide race and gender descriptions. I mean, he did say that the individual could have been white or Hispanic and she turned out to be, as the officer called it in. And Mr. Yang was also to take down the license plate number, which assisted obviously assisted officers in the investigation here. And then again, as to the level of certainty, the trial court recognized that the confrontation for the ID took place in various parts once he was conducting the show up. And Mr. Yang was reluctant to confirm the ID until he got a good look of the defendant's face. So initially he said, yes, I am 80% sure. And he said something to the effect of, it looks like her from the outside. And officers then took that to mean that he meant her characteristics in terms of like height, weight, et cetera, but they wanted to get him to view her face. So then, you know, the defendant was placed in a way that she was facing the patrol car that Mr. Yang was seated in. And the record reflects explicitly that Mr. Yang confirmed defendant's identity, which is provided on page 83 and 86 of the record, as well as the video exhibit titled confirmation one in squad car between zero and 34 seconds. I would rest on the remaining issues that I understand. The defendant has also raised a ineffective assistance council issue. Again, this court would need to find an error occurred. The state maintains that no error occurred here. And we would ask this court to affirm the lower courts ruling denying the defendant's motion and affirming his convictions. Thank you, your honor. I believe you also cited the Biggers case. Do you agree that those factors are determinative? Yes, sir. Yes, your honor. Okay. Thank you. Counsel rebuttal. Thank you, your honor. A few points on rebuttal. One being that that case people be spec, but the state sites in terms of finding a show up, justified by based on opportunity to view is actually the case of people be Richard spec, which the the witness there spent the entire night with the killer. Without any disguise, the Illinois Supreme Court found that the opportunity to view in that case was unmatched. Compared to possibly any other murder case. So this is not that the opportunity to view while Yang and Bruce say the recent spec case. Yes, your honor. That's a good while back. Yes, I remember that case. Yes, a little bit better of an opportunity to view that in this case where Yang initially guesses that they were together that he was with the driver on the side of the road for three minutes. And then at trials, that's five minutes, which is almost double. And that makes sense under the people be learn out where the Illinois Supreme Court found expert testimony that eyewitnesses tend to overestimate timeframes, probative of reliability. And here, given the fact that Yang could not describe any distinguishing details, the officers found his description poor, they put that in their own police report. And Yang insisted that he was determined to call police from the very beginning, it seems like maybe three minutes might be an overestimate. Also, the state raises the fact that this issue is forfeited, which we do agree, but we raised Misty motto argues that this claim could be ineffective assistance counsel. But we think the strongest argument is definitely first prong plane error. This is the only evidence that Misty motto was the driver introduced at trial. So if this identification is deemed unduly suggestive and unreliable, it's not only closely balanced, it's objectively there is no evidence that Misty motto committed either offense. In conclusion, this is a unnecessary, incredibly suggestive and unreliable identification. The state failed to prove guilt beyond a reasonable doubt. And this is the exact type of error that the police department here has tried to protect against. So we respectfully ask this court to reverse both convictions outright. Thank you. Well, thank you, counsel. The court will take the matter under advisement and issue its decision in due course, of course, with the other panel members participating, including Justice Kate and Justice Welch.